**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SIGMA LITHIUM CORPORATION,

          *Plaintiff*,

     v.

CALVYN GARDNER and LUIZA VALIM,

          *Defendants*.

Case No. 1:23-cv-07403

**ORAL ARGUMENT**
**REQUESTED**

---

**Plaintiff Sigma Lithium Corporation's Memorandum Of Law In Opposition To Defendants' Motion To Dismiss**

---

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
Michael B. Carlinsky
Mario O. Gazzola
Danielle Lazarus

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
mariogazzola@quinnemanuel.com
daniellelazarus@quinnemanuel.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

I.      Sigma's Board—Including Gardner—Initiates An M&A Process In New York...............2

II.     Sigma And The Financial Advisor Manage The M&A Process In New York ..................3

III.    Unbeknownst To Sigma, Ms. Valim Uses Her Access To The Data Room To
        Exact Revenge On Ms. Cabral By Harming Sigma...............................................................5

IV.     Ms. Valim Resigns, Steals 80,000 Documents From The Data Room, And Shares
        Them With Mr. Gardner ........................................................................................................5

V.      Sigma Investigates This And Other Misconduct And Initiates Litigation...........................6

VI.     Defendants Refuse To Accept Service Of The Complaint And Continue Their
        Wrongdoing, Including From New York................................................................................7

ARGUMENT ..........................................................................................................................8

I.      This Court Has Personal Jurisdiction Over Both Defendants...............................................9

        A.      This Court Has Personal Jurisdiction Over Both Defendants Pursuant To
                CPLR § 302(a)(1) ....................................................................................................9

                1.      CPLR § 302(a)(1) Confers Jurisdiction Over Ms. Valim ........................10

                2.      CPLR § 302(a)(1) Confers Jurisdiction Over Mr. Gardner ......................15

        B.      This Court Has Personal Jurisdiction Over Ms. Valim Pursuant To
                CPLR § 302(a)(2) ..................................................................................................17

        C.      This Court Has Personal Jurisdiction Over Both Defendants Pursuant To
                CPLR § 302(a)(3) ..................................................................................................20

II.     Exercising Personal Jurisdiction Over Both Defendants Comports With The Due
        Process Clause .....................................................................................................................23

III.    Dismissal For Forum Non Conveniens Is Not Appropriate................................................26

IV.     In The Alternative, Plaintiff Seeks Limited Jurisdictional Discovery And Leave
        To Replead ...........................................................................................................................28

CONCLUSION......................................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

, *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*,
480 U.S. 102 (1987)......................................................................................................23, 24

*Avila v. Lease Fin. Grp., LLC*,
2012 U.S. Dist. LEXIS 74860 (S.D.N.Y. May 30, 2012)........................................................8

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
902 F.2d 194 (2d Cir. 1990)....................................................................................................9

*Banco Nacional Ultramarino, S.A. v. Chan*,
169 Misc. 2d 182, 641 N.Y.S.2d 1006 (Sup. Ct. 1996)........................................................ 18

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002)..............................................................................................24, 25

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State of Bank of Pak.*,
273 F.3d 241 (2d Cir. 2001)....................................................................................................27

*Bensusan Rest. Corp. v. King*,
126 F.3d 25 (2d Cir. 1997)......................................................................................................19

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
582 U.S. 255 (2017)..................................................................................................................9

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)................................................................................................................12

*Cicalo v. Harrah's Operating Company, Inc.*,
2008 WL 1847665 (S.D.N.Y. Apr. 24, 2008)..................................................................28, 29

*Citigroup Inc. v. City Holding Co.*,
97 F. Supp. 2d 549 (S.D.N.Y. 2000)................................................................................18, 22

*The City of Philadelphia Bd. of Pensions & Ret. v. Winters*,
2022 N.Y. Slip Op. 34589 (N.Y. Sup. Ct. 2022)..................................................................28

*Cohen v. BMW Investments L.P.*,
144 F. Supp. 3d 492 (S.D.N.Y. 2015)....................................................................................13

*Coliseum Park Apts. v. Coliseum Tenants*,
742 F. Supp. 128 (S.D.N.Y. 1990) ........................................................................................11

*Daventree Ltd. v. Republic of Azer.*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ........................................................................26, 29

*Davidoff v. Davidoff*,
   12 Misc. 3d 1162(A), 819 N.Y.S.2d 209 (Sup. Ct. 2006) ................................................17, 19

*Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*,
   7 N.Y.3d 65 (2006) .........................................................................................................9, 10

*Edwards v. McMillen Cap., LLC*,
   2022 WL 16984534 (2d Cir. Nov. 17, 2022) .........................................................................19

*Ehrlich-Bober & Co. v. Univ. of Hous.*,
   49 N.Y.2d 574 (1980) ..........................................................................................................12

*Esheva v. Siberia Airlines*,
   499 F. Supp. 2d 493 (S.D.N.Y. 2007) ...................................................................................27

*Feathers v. McLucas*,
   15 N.Y.2d 443 (1965) ..........................................................................................................19

*Fischbarg v. Doucet*,
   9 N.Y.3d 375 (2007) .....................................................................................................11, 13

*Foman v. Davis*,
   371 U.S. 178 (1962).............................................................................................................30

*Fox v. Boucher*
   794 F.2d 34 (2d Cir. 1986)...................................................................................................24

*Ghazoul v. International Management Systems, Inc.*,
   398 F. Supp. 307 (S.D.N.Y. 1975) .........................................................................................8

*Grimaldi v. Guinn*,
   72 A.D.3d 37 (2d Dep't 2010) .......................................................................................11, 12

*Gucci Am., Inc. v. Frontline Processing Corp.*,
   721 F. Supp. 2d 228 (S.D.N.Y. 2010)...................................................................................23

*Gulf Oil Corporation v. Gilbert*
   330 U.S. 501 (1947)............................................................................................................28

*Hearst Corp. v. Goldberger*
   1997 WL 97097 (S.D.N.Y. Feb. 26, 1997)...........................................................................24

*In re Methyl Tertiary Butyl Ether*,
   399 F. Supp. 2d 325 (S.D.N.Y. 2005)...................................................................................25

*Int'l Shoe Co. v. Wash.*,
   326 U.S. 310 (1945)....................................................................................................23

*John Hancock Mut. Fife Ins. Co. v. Amerford Int'l Corp.*,
   22 F.3d 458 (2d Cir. 1994).......................................................................................30

*Kogan Law Grp. v. Brace*,
   2020 WL 5038764 (S.D.N.Y. Aug. 26, 2020) ...................................................10, 11

*LaSala v. UBS, AG*,
   510 F. Supp. 2d 213 (S.D.N.Y. 2007)......................................................................27

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013).....................................................................................23

*Liu Jo S.P.A. v. Jenner*,
   630 F. Supp. 3d 501 (S.D.N.Y. 2022)......................................................................25

*Manhattan Life Ins. v. AJ Stratton Syndicate*,
   132 F.R.D. 139 (S.D.N.Y. 1990) .............................................................................17

*Manhattan Life Ins. v. AJ Stratton Syndicate*,
   731 F. Supp. 587 (S.D.N.Y. 1990) ..........................................................................16

*Mayes v. Leipziger*
   674 F.2d 178 (2d Cir. 1982).....................................................................................15

*Metro Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996).......................................................................................23

*Minnie Rose LLC v. Yu*,
   169 F. Supp. 3d 504 (S.D.N.Y. 2016)........................................................................9

*Morgenthau v. A.J. Travis Ltd.*,
   184 Misc. 2d 835, 708 N.Y.S.2d 827 (Sup. Ct. 2000)............................................19

*Murdock v. Arenson Int'l USA, Inc.*,
   157 A.D.2d 110 (1st Dep't 1990) .............................................................................21

*Nat'l Union Fire Ins. Co. v. Frasch*,
   751 F. Supp. 1075 (S.D.N.Y. 1990)..................................................................12, 26

*Newman Capital LLC v. Private Capital Grp.*,
   2024 WL 1329801 (S.D.N.Y. Mar. 28, 2024) .........................................................16

*Nordic Bank PLC v Trend Group, Ltd.*,
   619 F.Supp 542 (S.D.N.Y. 1985) ............................................................................16

*Norex Petroleum Ltd. v. Access Indus.*,
   416 F.3d 146 (2d Cir. 2005).............................................................................27

*Park v. Kim*,
   91 F.4th 610 (S.D.N.Y. 2023)...........................................................................4

*Parker Waichman Alonso LLP v. Orlando Firm*,
   2010 WL 1956871 (S.D.N.Y. 2010)................................................................22

*PDK Labs, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997)...........................................................................19

*Pfizer Inc. v. Gilman*,
   2002 WL 215653 (S.D.N.Y. Feb. 13, 2002).....................................................8

*Pincione v. D'Alfonso*
   506 F. App'x 22 (2d Cir. 2012).......................................................................15

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) .............................................................................8

*Porco v. Phx. Bldg. Corp.*,
   2019 WL 2210659 (S.D.N.Y. May 21, 2019) .................................................24

*Prout v. Vladeck*,
   334 F. Supp. 3d 599 (S.D.N.Y. 2018)........................................................14, 15

*Rates Tech. Inc. v. Cequel Communications, LLC*,
   15 F. Supp. 3d 409 (S.D.N.Y. 2014)................................................................22

*Rosenblatt v. Coutts & Co. AG*,
   750 F. App'x 7 (2d Cir. 2018).........................................................................10

*Rosenblatt v. Coutts & Co. AG*
   674 F.2d 178 (2d Cir. 1982).............................................................................15

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*,
   22 F.4th 103 (2d Cir. 2021) .............................................................................19

*Security Nat'l Bank v. Republic National Life Insurance*,
   364 F. Supp. 585 (S.D.N.Y. 1973) ..................................................................12

*St. Tropez Inc. v. Ningbo Maywood Indus. & Trade Co.*,
   2014 WL 3512807 (S.D.N.Y. July 16, 2014)..................................................25

*State v. Vayu, Inc.*,
   39 N.Y.3d 330 (2023).......................................................................................16

*Stroock & Stroock & Lavan v. Valley Sys., Inc.*,
    1996 WL 11249 (S.D.N.Y. Jan. 11, 1996) ............................................................17

*In re Sumitomo Copper Litig.*,
    120 F. Supp. 2d 328 (S.D.N.Y. 2000) .................................................................21

*Sybron Corp. v. Wetzel*
    413 N.Y.S.2d 127 (1978) ....................................................................................22

*Topps Co. v. Gerrit J. Verburg Co.*,
    961 F. Supp. 88 (S.D.N.Y. 1997) .......................................................................23

*In re Union Carbide Corp. Consumer Products Business Securities Litigation*,
    666 F. Supp. 547 (S.D.N.Y. 1987) .....................................................................16

*United States v. Davis*,
    767 F.2d 1025 (2d Cir. 1985) .............................................................................26

*United States v. Ivanov*,
    175 F. Supp. 2d 367 (D. Conn. Dec. 6, 2001) ..............................................25, 26

*United States v. Muench*,
    694 F.2d 28 (2d Cir.1982) ..................................................................................27

*United States v. Y%20ucel*,
    97 F. Supp. 3d 413 (S.D.N.Y. 2015) ..................................................................26

*Vera v. Republic of Cuba*,
    91 F. Supp. 3d 561 (S.D.N.Y. 2015) ..................................................................28

*Walden v. Fiore*,
    571 U.S. 277 (2014) .............................................................................................9

*Whitaker v. Am. Telecasting, Inc.*,
    261 F.3d 196 (2d. Cir. 2001) ...........................................................................8, 12

*Whitaker v. Fresno Telstat. Inc.*,
    87 F. Supp. 2d 227 (S.D.N.Y. 1999) ..................................................................24

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*,
    2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ....................................................16

## **Other Authorities**

CPLR § 302................................................................................................ *passim*

CPLR § 327(a) ...........................................................................................26

Fed. R. Civ. P. 15(a)(2)..............................................................................30

Rule 12(b)(2)................................................................................................8

Plaintiff Sigma Lithium Corporation ("Sigma") respectfully submits this Memorandum of Law in opposition to Defendants Calvyn Gardner and Luiza Valim ("Defendants'") Motion to Dismiss Plaintiff's Complaint ("Motion to Dismiss").

## PRELIMINARY STATEMENT

On May 13, 2023, Luiza Valim resigned from her position at Sigma, where her role consisted of working with Sigma's New York-based financial advisor to manage a data room supporting Sigma's M&A process and populate it with Sigma's confidential and trade secret documents. Three days *after* her resignation, beginning on May 16, 2023, Ms. Valim violated the Computer Fraud and Abuse Act, a U.S. criminal statute, by improperly using the credentials she had acquired from Sigma's financial advisor to access Sigma's confidential data room. Over the course of two days, Ms. Valim downloaded and stole *80,000 documents* from that data room.

Later, Ms. Valim shared those documents with Calvyn Gardner, who has been using them to this day in furtherance of his revenge campaign against Ana Cabral, Sigma's CEO. Defendants have not been coy about their goals of harming Sigma in order to extract leverage against Ms. Cabral. In the wake of her theft, Ms. Valim boasted to one of Ms. Cabral's business partners that as a result of Defendants' schemes, the M&A was "over."

That is what this case is about. Nothing less, nothing more.

This action belongs in the United States because, among other reasons, Ms. Valim's theft was in violation of a federal criminal statute. And it belongs in this district because New York's long-arm statute is a "single act statute" requiring just one transaction in New York to invoke jurisdiction. And here, Defendants engaged in multiple transactions in New York, including but not limited to: (1) Mr. Gardner in his then-role as member of Sigma's Board voted to initiate the M&A process for which the data room was used in a board meeting in New York City; (2) Ms. Valim placed herself in a position to steal the documents in the data room through her extensive,

repeated, and intentional contacts with Sigma's New York-based financial advisor in calls, emails, Zooms, and more; and (3) Defendants' scheme is targeted at interfering with Sigma's M&A process and reducing the share price of Sigma's NASDAQ shares.

Defendants' motion to dismiss—which largely relies upon seventeen pages of irrelevant facts, accusations, and innuendo from outside the Complaint—should be denied.

## FACTUAL BACKGROUND

### I.    Sigma's Board—Including Gardner—Initiates An M&A Process In New York

Sigma is an industry-leading lithium processing and mining company operating in Brazil and with shares listed on the NASDAQ.  Compl. ¶¶ 2, 12.

In the second quarter of 2022, Sigma began considering potential strategic options for the company, including a potential M&A.  Contrary to Mr. Gardner's assertion that he only learned about the M&A process in January 2023, Gardner Decl. ¶ 6, he was an active part of the decision to initiate the M&A process and to enlist sophisticated advisors based in New York.  Indeed, in July 2022, Gardner and Cabral exchanged emails discussing Gardner "tak[ing] a more central role in the M&A process for Sigma *that we agreed to start on the second semester*."  Carlinsky Decl. Ex. 3.  Gardner emailed Cabral requesting that her "lawyers in Manhattan send [him] an invite" for a meeting with one potential advisor's New York team.  *Id.*  Gardner attended that meeting and interacted with that potential advisor's New York team.  Carlinsky Decl. Ex. 4.[1]

In September 2022, following interviews with potential advisors, Sigma's board of directors (the "Board") held a board meeting in the NASDAQ building in New York City.  Compl.

---

[1]  In his declaration, Mr. Gardner asserts that he had no knowledge of an M&A process until January 8, 2023.  Dkt. 38 ¶ 6.  This assertion is inconsistent with the emails he sent and received in July 2022.  Mr. Gardner's assertions should be given no weight.

¶ 29.  During that meeting, the Board (including Mr. Gardner) voted to create a special committee tasked with exploring strategic options for the company, including a potential M&A process.  *Id.*

In connection with evaluating strategic options, the board engaged a sophisticated team of financial advisors from Bank of America Securities, Inc. (the "Financial Advisor"), located in New York City, to manage the M&A process out of New York.  Compl. ¶ 30.

## II.    Sigma And The Financial Advisor Manage The M&A Process In New York

Given her prior experience at a major investment bank, the Company and A10 Serviços Especializados de Avaliação de Empresas Ltda. ("A10") hired Ms. Valim to interface with these New York-based bankers and to assist with the company's evaluation of an M&A transaction. Compl. ¶ 30.  Ms. Valim became one of the Company's leads in interfacing with the Financial Advisor, and its New York bankers.  Compl. ¶ 31.  Ms. Valim communicated directly with these bankers, day-after-day, via telephone, email, and zoom.  *Id.*

As is typical in any M&A process, Sigma and the Financial Advisor used a data room to host materials that could be shared with potential bidders.  Compl. ¶ 32.  The data room was organized and managed by the Financial Advisor—who coordinated access to the data room, including Ms. Valim's, *id.*, and managed the private portal that only Sigma and the Financial Advisor could access, as well as portals for potential buyers, Compl. ¶ 38.  And contrary to Defendants' contentions, Sigma's engagement letter with the Financial Advisor makes clear that the process was run out of the Financial Advisor's New York office:

- Sigma's relationship with the Financial Advisor is with the Financial Advisor's New York office, Carlinsky Decl. Ex. 5 at 1 (listing the Financial Advisor's New York address);

- The signatory on behalf of the Financial Advisor is New York-based Martin Sanchez. Carlinsky Decl. Ex. 5 at 6;

- The agreement is governed by the laws of the State of New York, Carlinsky Decl. Ex. 5 at 12 § IV(b);

3

- New York-based Martin Sanchez is listed as a key man on the engagement letter, as is Mr. Saravia,[2] who operated out of the New York office with a New York team for this engagement, Bernardini Decl. ¶¶ 7-8, Exs. A, B; and,

- Sigma was required to appoint its own process agent in New York in connection with the engagement, Carlinsky Decl. Ex. 5 at 12 § IV(c).

Contrary to Ms. Valim's assertions, the Financial Advisor's role was not "limited to providing access to potential bidders." Valim Decl. ¶ 5. The Financial Advisor managed Sigma's entire M&A process, including by providing financial advice and assistance in connection with the M&A process, and interacting with potential bidders. Bernardini Decl. ¶ 10. The Financial Advisor coordinated access to the confidential data room, provided individuals with access corresponding to their role, determined which documents to publish to potential bidders, and interacted with Ms. Valim to obtain documentation to add to the data room when necessary. *Id.*

As the Complaint makes clear, while the Financial Advisor organized and managed the data room from New York, it was "hosted in the United States."[3] Compl. ¶¶ 8, 16, 32, 45, 55; *see also* Roffman Decl. ¶¶ 5-6.

---

[2]    Ms. Valim suggests Mr. Saravia is based in Argentina. Valim Decl. ¶ 5. For this engagement, Mr. Saravia operated out of the New York office. Bernardini Decl. ¶ 8.

[3]    Due to Ms. Valim's theft of documents, Sigma was forced to engage forensic IT experts to investigate and identify the extent of the misconduct. Compl. ¶ 58. Prior to filing the Complaint, on August 11, 2023, Sigma's forensic experts analyzed the IP address of the data room and concluded that it resolved within the United States, including because the IP addresses all resolved to Amazon servers in the United States, rather than Brazil. Roffman Decl. ¶¶ 5-8. Sigma's forensic experts also determined that the data room hosting company uses a "content delivery network," a method through which data is replicated across several servers in order to permit for faster downloading and uploading. *Id.* ¶ 7. It is not surprising that Sigma's data would be replicated in United States servers, given that the Financial Advisor organized and managed the data from New York. Defendants' assertion that the data room is not hosted in the United States is based solely upon counsel's use and interaction with an "AI Agent." Dkt. 37-1 at 2-3 (showing "iDeals Helper" designated as "AI Agent"); Dkt. 37 ¶¶ 4-7 (describing counsel's interaction with the AI Agent, and describing no actions to verify that the information the AI Agent provided was accurate); *see Park v. Kim*, 91 F.4th 610, 615 (S.D.N.Y. 2023) (discussing need for attorneys to verify information provided by artificial intelligence). Further analysis revealed that even accessing the data room from Brazil requires going through a U.S.-hosted authorization portal. Roffman Decl. ¶¶ 9-12.

### III.    Unbeknownst To Sigma, Ms. Valim Uses Her Access To The Data Room To Exact Revenge On Ms. Cabral By Harming Sigma

Eight days after Sigma's Board, including Mr. Gardner, initiated the M&A process in New York, Mr. Gardner initiated divorce proceedings against Ms. Cabral.  Compl. ¶ 29.  After the M&A process was initiated Sigma hired Ms. Valim as a secondee to help manage the M&A process.  Compl. ¶ 30.  However, unbeknownst to the Company, Ms. Valim actually joined the Company and A10 to take advantage of the unique access she would have with the M&A process to interfere with the process and extract personal benefits for herself and Mr. Gardner.  *Id.*  Ms. Valim interacted with the New York-based bankers daily, misusing her position to plan a scheme to misappropriate the very confidential information she was providing to the bankers at their request in support of the M&A process.  Compl. ¶ 31.

Through her position, Ms. Valim gained unique access to the data room managed by the Financial Advisor.  Compl. ¶ 32-33.  The Financial Advisor coordinated Ms. Valim's privileged access to the data room.  Compl. ¶ 32.  Unlike market participants considering a bid for the Company who only had viewer access and limited printing capabilities for these documents, Valim's access authorized full download of all documents in the data room without watermarks.  Compl. ¶ 46.

### IV.    Ms. Valim Resigns, Steals 80,000 Documents From The Data Room, And Shares Them With Mr. Gardner

On May 13, 2023, Ms. Valim tendered her resignation to A10 and Sigma.  Three days later, using the credentials she acquired from the Financial Advisor, Ms. Valim mass downloaded ***80,000 confidential documents*** from the data room managed and operated by the Financial Advisor's New York-based team, including trade secret documents.  Compl. ¶¶ 43-46.  Those documents included, among other things, the Company's proprietary industrial designs and procedures for

processing lithium minerals, its "secret sauce," developed over four years of research.   Compl. ¶ 34.

Mr. Gardner denied involvement with Ms. Valim's decision to improperly download the confidential files.   Compl. ¶ 47.   However, within two days of Ms. Valim's illegal download of the Company's confidential data, Mr. Gardner travelled to the United States.   Compl. ¶ 48.   Upon information and belief, in the aftermath of her theft, and while Mr. Gardner was in the United States, Ms. Valim shared the information she stole with him.   Compl. ¶ 49.

Following the theft, Ms. Valim gloated to the Company's CEO's business partners on a flight in July 2023 that "due to Valim and Gardner's ongoing scheme, the M&A process was 'over,' giving Gardner leverage to demand half of Cabral's assets to settle the Divorce Proceedings."[4]   Compl. ¶¶ 10, 51.

## V.    Sigma Investigates This And Other Misconduct And Initiates Litigation

As a result of Ms. Valim's theft, Sigma engaged forensic IT experts to investigate and identify the extent of the misconduct.   Compl. ¶ 58.   Sigma has also investigated Mr. Gardner's extensive other misconduct.   Indeed, contrary to Mr. Gardner's attempts to paint himself as a victim, he was terminated from his role as CEO for trading in violation of a Company black-out period, and for breaching his fiduciary duties to the Company in other ways.[5]   Dkt. 37-2 at 2.

In an incredible example of projection, Defendants' motion to dismiss then spends four pages arguing that this case is part of a conspiracy to "blackmail" Mr. Gardner.   Not so.   Once

---

[4]    Contrary to Defendants' suggestion that references to the divorce proceedings are intended to support Ms. Cabral's position in those proceedings, Sigma references them in the Complaint because both Mr. Gardner and Ms. Valim have made clear those proceedings are what motivates their wrongdoing and their scheme.

[5]    Notwithstanding Mr. Gardner's attempt to blame Ms. Cabral for the consequences of his own misconduct, he was voted off Sigma's board by the **_shareholders_**.   Mot. at 11 (conceding "Mr. Gardner was voted off the Board in a shareholder meeting").

Sigma's forensic investigation revealed the extent of Ms. Valim's theft, and that the documents were stolen from a data room hosted in the United States, consistent with their fiduciary duties, the Board directed the Company to initiate this lawsuit.[6]  The Company has also sued Mr. Gardner for other misconduct uncovered in its investigation in the appropriate forums.  For example, the Company is litigating against Mr. Gardner in Brazil, and initiated a separate action relating to Mr. Gardner's breaches of fiduciary duties in New York Supreme Court.[7]

### VI.    Defendants Refuse To Accept Service Of The Complaint And Continue Their Wrongdoing, Including From New York

Sigma filed its Complaint on August 21, 2023.  Dkt. 1.  That same day, Sigma asked Defendants to accept service via their U.S. counsel.  Dkt. 22 ¶ 11.  Defendants' counsel never responded, and so on August 30, 2023, Sigma initiated service via the Hague Service Convention, which can take between six and nine months.  Dkt. 22 ¶ 12.

In the eight months since the Complaint was filed, Defendants have continued to use Sigma's confidential information.  Indeed, Sigma has reason to believe Ms. Valim has done so *from New York*.  Ms. Valim's husband, Vaughn Gardner (Mr. Gardner's son) started a master's program at Columbia University in September 2023.  Ms. Valim alleges she did not move to New York with her husband, Dkt. 28 (noting Ms. Valim was served via the Hague Service Convention

---

[6]  Ms. Cabral's quote to Valor Economico merely indicates Sigma brought this action pursuant to the Board's fiduciary duty to protect the Company from Defendants' theft.  Mot. at 17.

[7]  Defendants suggest that the New York state court case was filed as an "insurance policy" for this matter.  Mot. at 2 n.1.  Rather, that case concerns separate misconduct unrelated to Ms. Valim's theft of, and Mr. Gardner's use of, the materials in Sigma's data room.  And contrary to Defendants' misleading summary of the state of play in that case, Sigma moved for alternative service against Mr. Gardner via his counsel at Cleary, or in the alternative, for an extension of time to serve Mr. Gardner (due to delays in the Hague service process).  The state court did not grant Sigma's request for alternative service—the court bracketed the portion of the proposed order it was endorsing, but within that bracketed portion, crossed out the paragraph requesting that service of the Order on Cleary be deemed sufficient service.  *See* Carlinsky Decl. Ex. 1 at 2.

in Brazil), but Sigma's process servers' inquiries at Vaughn Gardner's address revealed that she was, at a minimum, frequently present in New York. Carlinsky Decl. ¶ 4.

## <u>ARGUMENT</u>

At the motion to dismiss stage, the court should construe all pleadings and affidavits in Plaintiff's favor. *Ghazoul v. Int'l Mgmt. Servs.,* 398 F. Supp. 307, 309 (S.D.N.Y. 1975). Defendants include extensive declarations and materials outside the pleadings in their attempt to dismiss this claim—in fact, the factual background in Defendants' motion cites to matters outside the Complaint nearly twice as much as it cites the Complaint. *See* Dkt. 40 at 7-17.

To the extent that Defendants' declarations are contradictory to the factual allegations in the Complaint, all factual disputes should be decided in Sigma's favor: "In considering the materials submitted on a Rule 12(b)(2) motion, a court should . . . construe the pleadings and any submitted affidavits in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor." *Avila v. Lease Fin. Grp., LLC*, No. 11 CIV. 8125 KBF, 2012 WL 1948777, at *7 (S.D.N.Y. May 30, 2012); *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d. Cir. 2001) (same). And contrary to Defendants' assertion that their contesting Plaintiff's jurisdictional allegations necessitates a hearing (Mot. at 18), "only a *prima facie* showing is needed to defeat a jurisdiction testing motion *before discovery*." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196 (2d Cir. 1990) (emphasis in original). Jurisdiction must be established at a hearing "only *after discovery*." *Id.* (emphasis in original). At this "preliminary stage," Plaintiff's *prima facie* showing of jurisdiction may be established solely by allegations. *Id.* at 197-98; *see also Pfizer Inc. v. Gilman*, 2002 WL 215653, at *2 (S.D.N.Y. Feb. 13, 2002).

This Court has personal jurisdiction over Defendants because this action aris[es] out of or [is] related to the defendant's contact with the forum[.]" *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269 (2d Cir. 2023). As demonstrated below, both Defendants purposefully

directed their activities at the State of New York. Moreover, there is "an affiliation between the forum and the underlying controversy," thus conferring specific personal jurisdiction on both defendants. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262, 264 (2017). Asserting personal jurisdiction over Defendants is also consistent with the Due Process Clause.

## I.    This Court Has Personal Jurisdiction Over Both Defendants

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014). To properly exercise long-arm specific jurisdiction over a non-resident defendant, Plaintiff's cause of action must arise out of one (or more) of the enumerated bases for jurisdiction set out by New York's long-arm statute, CPLR § 302.

The Complaint establishes that this Court has specific personal jurisdiction over both Defendants. *First*, both Defendants are subject to personal jurisdiction under CPLR § 302(a)(1) because both Defendants transacted business within the state of New York. *Second*, Ms. Valim is subject to personal jurisdiction under CPLR § 302(a)(2) because she committed the tortious act of conversion within the State of New York. *Third*, both Defendants are subject to personal jurisdiction under CPLR § 302(a)(3) because they both committed tortious acts causing injury to persons within New York while regularly doing or soliciting business in New York.

### A.    This Court Has Personal Jurisdiction Over Both Defendants Pursuant To CPLR § 302(a)(1)

Under § 302(a)(1), a court examines "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 513 (S.D.N.Y. 2016) (internal citations omitted). Importantly, § 302(a)(1) is a "single act statute." *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006). That is, "proof of one transaction in New York" may be sufficient exercise

jurisdiction over a defendant "so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Id.* Both Defendants transacted business in New York and this lawsuit arises from those transactions.

### 1.    CPLR § 302(a)(1) Confers Jurisdiction Over Ms. Valim

Ms. Valim transacted business in the State of New York through her repeated and frequent interaction with the New York-based Financial Advisor. In fact, the only reason Ms. Valim had access to the data room at all is because the Financial Advisor coordinated Ms. Valim's access to the data room. *See* Compl. ¶ 32. And for over eight months, Ms. Valim interacted with and spoke to the Financial Advisor on virtually a daily basis.

The M&A process was managed out of New York by the Financial Advisor. Courts consider whether "under the totality of the circumstances Defendants availed themselves of the privileges of transacting business in the state and the benefits and protections of New York's laws." *Wilson*, 7 N.Y.3d at 71. The totality of the circumstances here support exercise of personal jurisdiction: Sigma's relationship with the Financial Advisor is with the Financial Advisor's New York office, Carlinsky Decl. Ex. 5 at 1 (listing the Financial Advisor's New York address); the key men are New York-based Martin Sanchez, and Martin Saravia who worked out of New York for the engagement, *id.* § 2 (listing Martin Sanchez and Martin Saravia); the signatory on behalf of the Financial Advisor is New York-based Martin Sanchez, *id.* Ex. 5 at 6; the agreement is governed by the laws of the State of New York, *id.* at 12 § IV(b)[8]; and Sigma even appointed its

---

[8]    Indeed, the choice of law provision in the Engagement Letter is a "significant factor" that bolsters the conclusion that the Court has personal jurisdiction over Ms. Valim. "A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law." *Kogan Law Grp. v. Brace*, 2020 WL 5038764, at *9 (S.D.N.Y. Aug. 26, 2020); *see also Rosenblatt v. Coutts & Co. AG*, 750 F. App'x 7, 11 (2d Cir. 2018) (a "choice-of-law clause identifying New York favors personal jurisdiction over defendant in New York"). Although Ms. Valim did not sign the engagement letter herself, as a Sigma employee and former investment banker, she undoubtedly knew or should

own process agent in New York in connection with the engagement, *id.* at 12 § IV(c).  All these factors show that the M&A process was plainly based in New York—this was Sigma's intent in engaging a New York-based financial advisor, given that Sigma understood most potential bidders would also be represented by New York banks and law firms.  Bernardini Decl. ¶ 4.  And in fact, consistent with that expectation, every company that ultimately placed a bid in the M&A process was represented by at least one New York-based financial institution.  *Id.*  When Valim formed and maintained a relationship with the Financial Advisor—a relationship governed by the laws of the State of New York, as specifically enumerated in the Engagement Letter—she also availed herself of the benefits and protections of New York's laws.  *See Kogan Law Grp. v. Brace*, 2020 WL 5038764, at *5 (S.D.N.Y. Aug. 26, 2020) (finding personal jurisdiction over an out-of-state defendant who signed an engagement agreement with a New York-based firm and then "repeatedly projected himself into New York by calling and emailing" the firm).

Thus, the fact that Ms. Valim lived and worked in Brazil during the relevant period is of no import in light of her constant outreach to the Financial Advisor.  New York courts routinely find that even defendants that have never stepped foot in the state nevertheless transact business in New York where "the nature and quality of the[] contacts," shows that they "established a substantial ongoing professional commitment" between themselves and persons in the State of New York.  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 377, 385 (2007) (finding California defendants who solicited services from a New York attorney over the course of 9 months were subject to personal jurisdiction in New York); *see also Grimaldi v. Guinn*, 72 A.D.3d 37, 51 (2d Dep't 2010) (finding the Court had personal jurisdiction over a defendant in Pennsylvania "in light of the

---

have known that she was acting pursuant to its agreed terms.  *See Coliseum Park Apts. v. Coliseum Tenants*, 742 F. Supp. 128, 133 n.4 (S.D.N.Y. 1990) ("[P]arties may be fully and completely bound to a contract even if they do not sign it, if they act pursuant to it.").

number, nature, and timing of all of the contacts involved, including the numerous telephone, fax, e-mail, and other written communications with the plaintiff in New York that [defendant] initiated[.]").    In short, because of the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (emphasis in original).

Indeed, despite working in Brazil, Ms. Valim transacted business with New York on a near-daily basis.    Ms. Valim was one of Sigma's leads in liaising with Sigma's New York-based Financial Advisor.[9]    The quality and frequency (over the course of ***8 months***) of Ms. Valim's contacts with the New-York based advisor establishes a transaction of business in New York.    *See Sec. Nat'l Bank v. Republic Nat'l Life Ins. Co.*, 364 F. Supp. 585, 589 (S.D.N.Y. 1973) (personal jurisdiction upheld where defendant, an out of state corporation with no officers, employees, telephone listings, or bank accounts in New York, was "present" in New York by virtue of a series of negotiations and execution of an agreement with a New York-based party).    Based on the "totality of the circumstances, in light of the number, nature, and timing of all the contacts involved, including the numerous telephone [], e-mail and other written communications with" Sigma's financial advisor in New York that Valim initiated, Ms. Valim "must be deemed to have sufficient contacts with this State." *Grimaldi*, 72 A.D. 3d at 51; *see also Ehrlich-Bober & Co. v. Univ. of Hous.*, 49 N.Y.2d 574, 577 (1980) (exercising long-arm jurisdiction over Texas defendant

---

[9]    Ms. Valim's suggestion that the Financial Advisor was based out of Argentina is incorrect.    It is contradicted by the Complaint and by Sigma's declarations, *see supra* Factual Background, Section II, and thus should be disregarded.    *Whitaker*, 261 F.3d at 208 ("Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.").

where the securities transactions at issue "arose out of telephone calls made to the plaintiff's New York office").

*Fishbarg* is instructive. There, the New York Court of Appeals found the California-based defendant transacted business in New York based on his "purposeful attempt to establish an attorney-client relationship [in New York] and their direct participation in that relationship via calls, faxes and e-mails that they projected into this state over many months." 9 N.Y.3d at 380. The Court of Appeals noted that although it is "impossible to precisely fix those acts that constitute a transaction of business," New York precedent establishes that "it is the quality of the defendant's New York contacts that is the primary consideration." *Id.* Like the defendants in *Fischbarg*, Ms. Valim purposefully established a business relationship with the New York-based Financial Advisor from October 2022 to May 2023. Compl. ¶¶ 31-32. She had ***daily*** contact with the Financial Advisor—which was engaged specifically to manage the M&A process ***out of its New York Office, with a lead New York banker***—and was privy to sensitive and confidential company information because the Financial Advisor coordinated her access to the data room. Compl. ¶¶ 30-31. For these reasons, Ms. Valim's suggestion that her connection to New York was "entirely incidental, not purposeful" is simply not credible. Mot. at 20-21.

Personal jurisdiction is also proper here because Ms. Valim could not have stolen Sigma's documents without her outreach to the Financial Advisor. Where a defendant's transactions in New York are a "but for cause" of the litigation, those transactions provide a "sufficient relationship between the claim and the defendant's contacts with New York." *Cohen v. BMW Investments L.P.*, 144 F. Supp. 3d 492, 498 (S.D.N.Y. 2015). Ms. Valim's outreach to the Financial Advisor to obtain credentials to the data room, Compl. ¶ 32, are a but for cause of her theft—without obtaining access, she would not have been able to download the data room's entire

contents.  Similarly, many of the documents Ms. Valim ultimately stole would not have been in the data room but for Ms. Valim's interaction with the Financial Advisor to populate the data room with additional materials.  Bernardini Decl. ¶ 10.

Defendants' arguments against jurisdiction under CPLR § 302(a)(1) consist primarily of inventing an "allegation" in the Complaint, and then claiming that the allegation Defendants invented was untrue.  *Compare* Mot. at 5 ("The central jurisdictional hook is Plaintiff's allegation that the data room at issue in this case was located in New York.") *with* Compl. ¶ 8 (Valim "illegally accessed a confidential data room hosted ***in the United States*** . . . .").  But contrary to Defendants' tortured reading of the Complaint, the primary jurisdictional hooks against Ms. Valim are not the location of the data room, but (i) her outreach to the Financial Advisor to obtain access to the data room, and (ii) her eight months of near-daily interaction with the Financial Advisor to manage and organize the materials on the data room and seek advice for Sigma in connection with the M&A transaction.

Defendants also attempt to argue against personal jurisdiction by downplaying Ms. Valim's contacts with the Financial Advisor's team, and purporting to draw parallels between Valim's connection to New York and other examples of "entirely incidental, not purposeful," connections to the state.  *See* Mot. at 21.  But the cases Defendants rely upon are inapposite.  For example, the defendants in *Prout* participated in phone calls with persons in New York for purposes ***unrelated to the litigation***.  *See Prout v. Vladeck*, 334 F. Supp. 3d 599, 613 (S.D.N.Y. 2018) (in a legal malpractice action brought by a client against his attorney, "[Defendant] was not retained to work on [Plaintiff's] case . . . , and he and his former law firm derived no income from his participation in the conference calls").  Unlike the defendants in *Prout*, Ms. Valim's purpose in engaging with the New York-based financial advisor was to obtain access to the data room, help populate the

data room with the very documents she would later steal, Dkt. 39 ¶ 5, and further a deal process involving potential bidders *in New York* and access data stored on a server hosted in the United States, Compl. ¶ 32.

The cases collected in *Prout* are similarly inapplicable. In *Pincione v. D'Alfonso*, for example, the court found the defendants' contacts with New York "were intended to facilitate a business deal in Italy, where the relevant corporations and bank accounts were located." *Pincione v. D'Alfonso*, 506 F. App'x 22, 25 (2d Cir. 2012). Plaintiff has pled that Ms. Valim's contacts *in New York* facilitated a potential business deal involving potential bidders *in New York*. *Mayes v. Leipziger* is easily distinguished because unlike Ms. Valim, those defendants never initiated contact with individuals in New York. *Mayes v. Leipziger,* 674 F.2d 178, 185 (2d Cir. 1982). And in *Rosenblatt v. Coutts & Co. AG*, the agreement that the defendant allegedly breached was negotiated in Switzerland, concerned property in Switzerland, and was subject to Swiss law. *Rosenblatt v. Coutts & Co. AG,* 2017 WL 3493245, at *3-4 (S.D.N.Y. Aug. 14, 2017). Ms. Valim, on the other hand, was operating under an engagement letter subject to New York law (*see supra* at 3, Compl. ¶ 8, 9) and stole data hosted in the United States.

## 2. CPLR § 302(a)(1) Confers Jurisdiction Over Mr. Gardner

Mr. Gardner also transacted business in New York by voting to initiate the M&A process at a board meeting in New York. This lawsuit arises from his business transaction, because without an M&A process, the data room would not have been updated with the documents Ms. Valim stole. Jurisdiction based on CPLR § 302(a)(1) is thus proper. Defendants' claim that "Mr. Gardner's attendance at a single Sigma board meeting in New York is not even close to enough" to confer personal jurisdiction is not supported by New York law. The only case Defendants cite to support this proposition involves distinguishable circumstances where a plaintiff tried to establish specific jurisdiction over a defendant based on defendants' transactions with *other* unrelated companies.

*See* Mot. at 21 (citing *Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, 2020 WL 5503557, at *4 (S.D.N.Y. Sept. 10, 2020)).

Here, Mr. Gardner was present in New York City at the September 2022 Board Meeting when the Board decided to evaluate the possibility of a potential M&A transaction.  Compl. ¶ 29.  Mr. Gardner voted to approve the creation of a special committee to explore M&A options.  *Id.*  Attendance at board meetings constitutes the transaction of business.  *Nordic Bank PLC v Trend Group, Ltd.*, 619 F.Supp 542, 567 (S.D.N.Y. 1985); *see also In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 666 F. Supp. 547, 572 (S.D.N.Y. 1987) ("This Court determines that the attendance by [defendants] of the [business] meetings . . . constitutes the transacting of business within the State of New York.").

Where, as here, the board meeting concerned matters relevant to this action, the circumstances strongly favor the exercise of jurisdiction over Mr. Gardner.  *See Newman Capital LLC v. Private Capital Grp.*, 2024 WL 1329801, at *7 (S.D.N.Y. Mar. 28, 2024) (finding plaintiff sufficiently pled personal jurisdiction as to the defendants who "conducted business in Manhattan on behalf of [the Company]" by "travel[ling] to New York for the purposes of meeting with" members of the Company);  *State v. Vayu, Inc.*, 39 N.Y.3d 330, 337 (2023) (finding defendant who attended meetings in New York which formed the basis of the subject matter of the cause of action "should reasonably have anticipated being haled into court [in New York]"); *see also Manhattan Life Ins. v. AJ Stratton Syndicate*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990) (finding that "one meeting in New York" would be sufficient to confer personal jurisdiction over defendant if it had a "substantial or crucial relationship to the matters which form the basis for this litigation").[10]

---

[10]    While the court found that "one meeting in New York" provided sufficient contacts to find that defendants were transacting business in New York, the court did not find jurisdiction on this basis because "plaintiffs have not provided any facts regarding the subject matter" of the

And Defendants' assertion that there is no nexus between Mr. Gardner's participation in the September 2022 board meeting and Sigma's claims (Mot. at 22-23) is misplaced. During that meeting, Mr. Gardner voted to create a special committee that would initiate the M&A process and engage the Financial Advisor. *Stroock & Stroock & Lavan v. Valley Sys., Inc.*, 1996 WL 11249, at *3 (S.D.N.Y. Jan. 11, 1996) (finding that interview conducted in New York satisfied requirements of § 302(a)(1) because, "***most important[ly]***" it "significantly advanced and was important to the creation of the agreement between" the parties (emphasis added)). The initiation of the M&A process, and the subsequent hiring of Ms. Valim to manage it, is a but for cause of Ms. Valim being in a position to access the data room in furtherance of Defendants' scheme to "exact revenge against the Company to gain leverage in [Mr. Gardner's] Divorce Proceedings." Compl. ¶¶ 29-30.

## B. This Court Has Personal Jurisdiction Over Ms. Valim Pursuant To CPLR § 302(a)(2)

CPLR § 302(a)(2) confers personal jurisdiction over Ms. Valim because she committed a tortious act within the state by obtaining access to the data room via the Financial Advisor while she was actively working to harm Sigma.

A defendant need not be physically present in New York for their tortious conduct to have a locus in, and therefore have been committed within, the state of New York for purposes of CPLR § 302(a)(2). Rather, "depending on the nature of the tort, the tortious act of defendant could occur in New York while defendant is physically present outside the boundaries of New York, and jurisdiction under 302(a)(2) may lie." *Davidoff v. Davidoff*, 12 Misc. 3d 1162(A), 819 N.Y.S.2d

---

meeting. 731 F. Supp. at 593. However, the court granted jurisdictional discovery, and the case proceeded. *See, e.g. Manhattan Life Ins. v. AJ Stratton Syndicate*, 132 F.R.D. 139, 140 (S.D.N.Y. 1990) (denying motion to amend answer).

209, at *8 (Sup. Ct. 2006).  When conducting this analysis, New York courts focus on "the locus of the tort, ***not whether defendant was physically here when the tortious act occurred***." *Banco Nacional Ultramarino, S.A. v. Chan*, 169 Misc. 2d 182, 188, 641 N.Y.S.2d 1006 (Sup. Ct. 1996), *aff'd sub nom. Banco Nacional Ultramarino, S.A. v. Moneycenter Tr. Co.*, 240 A.D.2d 253, 659 N.Y.S.2d 734 (1997) (emphasis added).

Most commonly, a defendant's tortious use of modern computer technologies effecting a tort with a locus in New York give rise to specific personal jurisdiction under CPLR § 302(a)(2), even if the defendant is physically present outside of the state.  For example, in *Banco Nacional Ultramarino, S.A. v. Chan*, the First Department held that the locus of a defendant's tortious conversion was in New York, notwithstanding that the defendant was physically in Nigeria for all of his tortious conduct, and therefore satisfied the presence requirement of CPLR § 302(a)(2).  169 Misc. 2d at 188.  The court explained that "to allow a defendant to conspire and direct tortious activities in New York, in furtherance of that conspiracy, and then avoid jurisdiction because it directs those activities from outside the state or country, is to ignore the reality of modern banking and computer technology in the end of the twentieth century." *Id.*  The court concluded that "[a] defendant with access to computers, fax machines etc., no longer has to physically enter New York to perform a financial transaction which may be criminal or tortious . . . . [T]he emphasis should be on the locus of the tort, not whether defendant was physically here when the tortious act occurred." *Id.* at 188.

*Banco Nacional* is not an anomaly.  New York courts time and again conclude that physical presence is not required for tortious conduct to be committed . . . within the state" for purposes of CPLR § 302(a)(2). *See, e.g.*, *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000) (finding that that personal jurisdiction was adequately alleged under CPLR § 302(a)(2)

where an out-of-state defendant accused of trademark infringement transmitted messages containing an alleged infringing mark through an "online chat with City National representatives" because the chats "involve[d] the transmission of messages that contain allegedly infringing marks to New York residents"); *Morgenthau v. A.J. Travis Ltd.*, 184 Misc. 2d 835, 843, 708 N.Y.S.2d 827 (Sup. Ct. 2000) (finding jurisdiction proper under CPLR § 302(a)(2) for conduct of an out-of-state defendant reaching New York bank accounts and observing that "for jurisdiction to be so acquired, it is not necessary that the defendant be physically present in the State").

Defendant's fleeting, single citation to a Second Circuit case is not dispositive on issues of state court law, including the scope of New York's long arm statute. District courts must apply the law of the forum state—here New York—in determining issues of personal jurisdiction. *See PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). When a federal court rules on issues of state substantive law, "rulings of the state's lower courts . . . provid[e] important data points for understanding state law." *Edwards v. McMillen Cap., LLC,* 2022 WL 16984534, at *3 (2d Cir. Nov. 17, 2022) (*quoting Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*, 22 F.4th 103, 120 (2d Cir. 2021)). Deference to New York lower courts is particularly important here, where "New York law is unsettled as to whether defendants' physical presence in New York while committing the tortious act is a prerequisite to jurisdiction under CPLR § 302(a)(2)."), *Davidoff*, 12 Misc. 3d 1162(A) at *6. Moreover, *Banco Nacional* distinguished the case upon which defendant's case, *Bensusan Rest. Corp. v. King*, principally relies. *Bensusan Rest. Corp. v. King*, 126 F.3d at 28 (analyzing *Feathers v. McLucas*, 15 N.Y.2d 443, 458 (1965)). As the First Department explained in *Banco Nacional*, requiring physical presence for torts that are effected in New York through electronic

means ignores how modern technology enables tortfeasors to act within the state from outside its borders.  169 Misc.2d at 188-89.

Accordingly, even though Ms. Valim was not present within the state when she conspired to acquire credentials to the data room from the Financial Advisor—the Complaint adequately alleged that Valim committed a tort within New York.  As detailed in the Complaint, Ms. Valim began working at A10 and Sigma around October 2022, ostensibly to aid in the M&A process that Sigma's board just kicked off in a board meeting in New York.  Compl. ¶¶ 29-30.  In reality, Ms. Valim planned to abuse the unique access and responsibilities given to her in this role to "us[e] the M&A process to her advantage" and "exact revenge against the Company to gain leverage in [Gardner's] Divorce Proceedings."  *Id.*  From then on, Ms. Valim maintained daily contact with Sigma's New York-based financial advisors, who "managed and operated" Sigma's secure data room, "under the artifice of attempting to advance progress towards a deal, while secretly attempting to secure confidential Company information from them."  Compl. ¶¶ 31, 16.  It was this daily manipulation of the role she assumed for A10 and Sigma and those specific interactions with the Financial Advisor that gave Ms. Valim access to Sigma's data room.  Compl. ¶ 32.

## C.    This Court Has Personal Jurisdiction Over Both Defendants Pursuant To CPLR § 302(a)(3)

In the alternative, the Court has personal jurisdiction over Mr. Gardner and Ms. Valim because they committed a tortious act outside of New York causing injury to property within the state, and regularly conduct business within the state.  C.P.L.R. § 302(a)(3) allows a court in New York to exercise specific personal jurisdiction over an out-of-state defendant who "commits a tortious act without the state causing injury to person or property within the state . . .  if he . . . (i) regularly does or solicits business, or engages in any other persistent course of conduct . . . in the

state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." *Id.*

Mr. Gardner committed conversion and wrongfully retained the confidential data Ms. Valim stole. Through the totality of their actions within and outside the state, Ms. Valim and Mr. Gardner jointly disrupted the ongoing deal process based in New York, as was their goal. Compl. ¶¶ 10, 51. That disruption caused injury within the state, namely, via a decline in the price of Sigma's shares, which are traded on NASDAQ. Compl. ¶ 12. Additionally, the information Ms. Valim stole was stored primarily for consideration of strategic options affecting over 1,000,000 shares registered and traded on NASDAQ. *Id.* ¶ 16. In disrupting the M&A Process, Defendants blindsided potential bidders, and their conduct affected a New York exchange. *Id.* ¶ 53. *See In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 342-44 (S.D.N.Y. 2000) (holding that New York court could exercise personal jurisdiction over defendants whose conduct affected copper prices on New York's Comex).

Second, both Defendants also "regularly do or solicit business" in New York, and Ms. Valim engaged in persistent communication with the New York-based advisors. "[T]o establish that a defendant 'does or solicits business' in New York, it must be shown that his 'overall contact with New York is substantial enough to make it reasonable to subject him to jurisdiction and feasible for him to defend here.'" *Murdock v. Arenson Int'l USA, Inc.*, 157 A.D.2d 110, 113 (1st Dep't 1990) (quoting Siegel, New York Practice, § 88). As described *supra* at 13, Ms. Valim purposefully established a business relationship with Bank of America in New York from October 2022 to May 2023. She had daily contact with the advisor—which was engaged specifically to manage the M&A process out of New York—and was privy to sensitive and confidential company information. Ms. Valim's communication with Bank of America in New York was also persistent.

Compl. ¶¶ 30-31.  Mr. Gardner voted to approve the creation of a special committee to explore M&A options, and his participation in the September 2022 Board Meeting constitutes the transaction of business.  *See supra* at 16.

Personal jurisdiction is also proper against Mr. Gardner under CPLR § 302(a)(3)(ii) because Mr. Gardner should have reasonably expected his conduct to have consequences in New York, and he derives substantial revenue from interstate or international commerce.

In analyzing whether the defendant should reasonably expect their acts to have consequences within the state, "New York courts require some discernible effort by the defendant to directly or indirectly serve the New York market."  *Parker Waichman Alonso LLP v. Orlando Firm*, 2010 WL 1956871, at *10 (S.D.N.Y. 2010).  Importantly, "[i]njury within the state includes harm to a business in the New York market in the form of lost sales or customers."  *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 568 (S.D.N.Y. 2000).  Mr. Gardner knew that illegally retaining Sigma's confidential data would disrupt the Company's business endeavors, including in New York.  *See Rates Techn. Inc. v. Cequel Commc'ns, LLC*, 15 F. Supp. 3d 409, 413 (S.D.N.Y. 2014) (finding defendant "should have reasonably expected its acts committed to have consequences" in New York where defendant infringed on a system that served customers "from many places").  And Mr. Gardner derives significant revenue from New York because his primary source of income is the sale of Sigma shares on NASDAQ, including shares he sold during a blackout period.  Dkt. 37-2 at 2.

In *Sybron Corp. v. Wetzel*, the plaintiff corporation brought suit for theft of trade secrets against a nonresident former employee.  413 N.Y.S.2d 127 (1978).  The court held that the requirements of CPLR § 302(a)(3) were fulfilled and the "admitted and controverted facts g[a]ve rise to the probable inference that there [wa]s a conscious plan to engage in unfair competition and

misappropriation of trade secrets." *Id.* at 131–32 (1978). Plaintiff met the New York injury requirement with a showing of the "threatened loss of important New York customers." *Id.* Similarly, here, Ms. Valim and Mr. Gardner should have known that the conversion of Sigma's confidential data could derail any potential New York-based bidders and disrupt the M&A process at large.

## II.    Exercising Personal Jurisdiction Over Both Defendants Comports With The Due Process Clause

Due process demands that defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). Relevant factors include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (internal citations omitted). Courts have also considered (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987); *Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996).

Although constitutional due process issue is a separate question, "[o]rdinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits." *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y. 1997). "Where the other elements for jurisdiction have been met, dismissals on reasonableness grounds should be 'few and far between.'" *Gucci Am., Inc. v. Frontline Processing*

*Corp.*, 721 F. Supp. 2d 228, 246 (S.D.N.Y. 2010) (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996)).[11]

**First**, jurisdiction over Defendants will not impose an undue burden.  *See Whitaker v. Fresno Telstat. Inc.*, 87 F. Supp. 2d 227, 233 n.6 (S.D.N.Y. 1999) (noting that "[t]his burden may be less onerous if one considers that [the defendant] could have and should have reasonably foreseen that its actions would have consequences in New York.").  In addition, Plaintiff has established Defendants' minimum contacts and courts "rarely find it unreasonable to compel personal jurisdiction when a business enjoys the fruits of a particular forum."  *Porco v. Phx. Bldg. Corp.*, 2019 WL 2210659, at *5 (S.D.N.Y. May 21, 2019).  Although there may be some burden on Defendants in defending themselves in New York, their decision to conduct substantial business here suggests that it is not an unreasonable burden.  *See Asahi Metal Indus. Co., Ltd.*, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").  Fundamentally, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant ***only weak support, if any,*** because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *Bank Brussels Lambert v.*

---

[11]    Defendants argue personal jurisdiction over Ms. Valim does not comport with due process because her communications with the Financial Advisor in New York "do not come close to amounting to the requite 'minimum contacts' with New York."  Mot. at 26.  The cases Defendants cite to support this proposition are unpersuasive.  Defendants misstate the holding and facts of *Fox v. Boucher*.  Defendant in *Fox* made *one single telephone call* to a New York resident.  794 F.2d 34 (2d Cir. 1986).  As described *supra* at 13, Ms. Valim was in communication with the Financial Advisor's New York-based team daily for eight months.  Similarly, the court did not confer personal jurisdiction in *Hearst Corp. v. Goldberger* because the defendant sent only "a few emails" and messages to the New York-based party **after** litigation began, and "[o]nly pre-litigation contacts are relevant to the jurisdictional question."  1997 WL 97097, at *12 (S.D.N.Y. Feb. 26, 1997).

*Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) (internal quotation marks and citations omitted) (emphasis added)).

**Second**, New York has an interest in adjudicating a dispute involving documents stolen during an M&A process initiated in New York and managed by New York-based financial advisors. *Liu Jo S.P.A. v. Jenner*, 630 F. Supp. 3d 501, 513 (S.D.N.Y. 2022) (finding Plaintiff made a prima facie showing that due process was satisfied because defendants "directed activities toward New York by engaging in an ongoing business relationship with New York corporations" utilizing these corporations "as their agents").

**Third**, Plaintiff's interest in convenient and effective relief weighs strongly in favor of Plaintiff bringing suit in New York. "[T]he third factor favors keeping New York as the forum state since plaintiff has a strong interest in obtaining redress for its claims, and New York may be the only place in the United States in which [defendant] is subject to personal jurisdiction on these claims." *St. Tropez Inc. v. Ningbo Maywood Indus. & Trade Co.*, 2014 WL 3512807, at *8 (S.D.N.Y. July 16, 2014).

**Fourth,** [i]n evaluating the factor concerning the efficient administration of justice, courts generally consider the location of witnesses and evidence. *In re Methyl Tertiary Butyl Ether*, 399 F. Supp. 2d 325, 334 (S.D.N.Y. 2005). Here, the witnesses and evidence are easily accessible through "the conveniences of modern communication." *See Bank Brussels Lambert*, 305 F.3d at 129-30. Also, both Brazil and New York are "marked with the traces of the transaction at issue." *Bank Brussels*, 305 F.3d at 130.

**Lastly**, exercising jurisdiction over Defendants furthers the United States' social policy against criminal abuse of computer systems. *E.g.*, *United States v. Ivanov*, 175 F. Supp. 2d 367,

374-75 (D. Conn. Dec. 6, 2001) (discussing Congress' intent to prevent "foreign-based hackers" from "infiltrat[ing] computer systems in the United States").

### III.    Dismissal For Forum Non Conveniens Is Not Appropriate

Defendants additionally ask this Court to dismiss Plaintiff's complaint for forum non conveniens. Such a dismissal is neither warranted nor appropriate. N.Y. CPLR § 327(a) permits a court to exercise its discretion to dismiss an action in whole or in part if it is "in the interest of substantial justice," even if the court otherwise has jurisdiction over the parties and subject matter. *Id.* The doctrine is based on the public policy that, even if jurisdiction is present, New York courts should not be forced to adjudicate cases that have little, or no, connection to New York. *Nat'l Union Fire Ins. Co. v. Frasch*, 751 F. Supp. 1075, 1081-82 (S.D.N.Y. 1990). As Plaintiff explains below, New York is a convenient and appropriate forum for this dispute.

*First*, there is a significant public interest in violations of U.S. criminal statutes being adjudicated in the United States. *See United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985) ("The United States has a strong national interest in the effective enforcement of its criminal laws.") (collecting cases); *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 756 (S.D.N.Y. 2004) ("Public interest ordinarily favors the enforcement of the federal law . . . in the United States courts.") (collecting cases).

*Second*, Brazil is not the more appropriate forum for this dispute. Mot. at 28. Sigma's claims are mostly unavailable in Brazil—and in particular, Sigma's claim for Ms. Valim's violation of the Computer Fraud and Abuse Act.[12] Defendants relegate to a footnote their argument

---

[12]    Even if Defendants are correct that the confidential data room was not hosted in the United States (and they are not, *see* Roffman Decl. ¶¶ 5-12), the Computer Fraud and Abuse Act ("CFAA") still applies because the CFAA defines "protect computer" as "a computer 'which is used in or affecting interstate or foreign commerce or communication, including a computer located **outside the United States** that is used in a manner that affects interstate or foreign commerce.'" *United States v. Y%20ucel*, 97 F. Supp. 3d 413, 418 (S.D.N.Y. 2015); *see also United*

that "[t]he availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum." Mot. at 28 n.8, quoting *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 222 (S.D.N.Y. 2007). But it does depend on whether the alternative forum "permits litigation of the subject matter of the dispute." *Norex Petroleum Ltd. v. Access Indus.*, 416 F.3d 146, 157-58 (2d Cir. 2005) (internal quotations and citations omitted). Defendants bear the burden of demonstrating that an adequate alternative forum exists. *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State of Bank of Pak.*, 273 F.3d 241, 248 (2d Cir. 2001). And as explained *supra* at 3, Sigma entered into an agreement with the Financial Advisor designating New York as the appropriate forum for disputes stemming from the engagement. Defendants either knew or should have known this fact.

*Third*, Defendants argue that Plaintiff's choice of forum is owed less deference because Plaintiff is headquartered in Canada and operates in Brazil. *See* Mot. at 27-28. But "the degree of deference to be accorded to a plaintiff's choice of forum moves on a sliding scale depending on the degree of convenience reflected by the choice in a given case." *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493, 497 (S.D.N.Y. 2007). Because Ms. Valim violated U.S. criminal law by stealing documents hosted in the United States, the United States is the better forum for this dispute than Canada or Brazil. Defendants' arguments about publicity are baseless, and unsupported by any allegations in the Complaint or in Defendants' affidavits. Additionally, Defendants' attempt to blame Sigma for the delay in serving Ms. Valim is particularly curious when Sigma repeatedly asked Defendants to accept service, but they refused, *see* Dkt. 21 ¶¶ 4-6, thus requiring Sigma to undergo the drawn out process under the Hague Convention.

---

*States v. Muench*, 694 F.2d 28 (2d Cir. 1982) ("The intent to cause effects within the United States . . . makes it reasonable to apply to persons outside United States territory a statute which is not expressly extraterritorial in scope.").

*Fourth*, whether an action should be dismissed for forum non conveniens involves a balancing of the private and public interests outlined in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508-09 (1947).  "Unless [that] balance is ***strongly*** in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  *Id.* at 508 (emphasis added).   Private and public factors favor a lawsuit in New York.  "Litigating this case in New York does not impose an undue hardship on Defendants, who chose to direct their business efforts towards this state."  *The City of Philadelphia Bd. of Pensions & Ret. v. Winters*, 2022 WL 20509490, at *6 (N.Y. Sup. Ct. 2022). Defendants' concern with the cost and convenience of obtaining witnesses are also inapposite, Mot. at 29, given that these costs are present in every single litigation, and there are plenty of measures available—including Zoom and other virtual measures—to reduce inconveniences as appropriate.   Lastly, Defendants' worries about "impos[ing] jury duty on citizens of New York" with no connections to the lawsuit is immaterial.  Given that New York City is "a leading world financial center" (*Vera v. Republic of Cuba*, 91 F. Supp. 3d 561, 570 (S.D.N.Y. 2015)), New Yorkers certainly have an interest in a dispute involving the disruption of an M&A process run out of New York that affected shares trading on a New York market.

## IV.  In The Alternative, Plaintiff Seeks Limited Jurisdictional Discovery And Leave To Replead

In the alternative, in light of developments since Sigma first filed this complaint and asked Defendants to waive service, the Court should give Sigma leave to move for limited jurisdictional discovery related to Defendants' contacts with the State of New York, or give Sigma leave to amend the Complaint.

Jurisdictional discovery should be permitted where the facts necessary to establish personal jurisdiction "lie exclusively within the defendant's knowledge."  *Cicalo v. Harrah's Operating Company, Inc.*, 2008 WL 1847665, at *6 (S.D.N.Y. Apr. 24, 2008).  Additionally, jurisdictional

discovery may be appropriate if Plaintiff has identified a "genuine issue of jurisdictional fact." *Daventree,* 349 F. Supp. 2d at 761. The Second Circuit has granted "jurisdictional discovery in order to develop the factual record requisite for [] a showing" of jurisdiction when a plaintiff's jurisdictional allegations are "neither sparse nor insufficiently specific." *Tex. Int'l Magnetics, Inc. v. BASF Aktiengesellschaft,* 31 F. App'x 738, 739 (2d Cir. 2002). Indeed, "the Court will be positioned to make a more informed decision following jurisdictional discovery." *Cicalo,* 2008 WL 1847665, at *6.

Through declarations and various exhibits, Defendants have denied all contacts with New York. However, Sigma has, at a minimum, established in this Opposition an array of "genuine issues of jurisdictional fact," including that Mr. Gardner and Ms. Valim both transacted business within the State of New York, Ms. Valim committed tortious acts within the State, and both Defendants committed tortious acts causing injury within New York while doing business in New York, should have expected their acts to have consequences in New York, and derive substantial revenue from international commerce. These allegations are "neither sparse nor insufficiently specific." *Tex. Int'l Magnetics, Inc.,* 31 F. App'x at 739.

Jurisdictional discovery is also appropriate because Plaintiff has learned new facts about Defendants' contacts with New York since filing its Complaint. Namely, while attempting to effect service more expeditiously, Plaintiff learned that Ms. Valim has, at a minimum, visited New York frequently since her husband began a master's program at Columbia University in the City of New York and moved to New York City full time. Carlinsky Decl. ¶ 4. Plaintiff has reason to believe that Valim may have improperly disclosed Sigma's confidential information and trade secrets while she was in New York to further interfere with the M&A process. The details surrounding these visits to New York and Ms. Valim's continued misuse of Sigma's confidential

29

and trade secret documents while in New York, are uniquely within Defendants' knowledge and are essential to the Court's evaluation of Defendants' claims that they lack sufficient contact with the state. Similarly, whether Mr. Gardner was present in New York during his trip to the United States the week Ms. Valim stole Sigma's documents is solely within his knowledge. Limited jurisdictional discovery would seek evidence of, among other things, Defendants' presence in New York during the relevant timeframe and Ms. Valim disclosure of Sigma's confidential data and trade secrets during her visits.

Alternatively, if the Court is inclined to dismiss the Complaint, Sigma respectfully requests that any dismissal be without prejudice with leave to amend and replead. Federal Rule of Civil Procedure 15(a)(2) states "the court should freely give leave when justice so requires." *Id*. And although courts have discretion as to whether to grant leave to amend (*John Hancock Mut. Fife Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994)), the Supreme Court has instructed that the mandate in Rule 15(a)(2) "is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Allowing amendment will give Plaintiff the ability to assert additional jurisdictional allegations, including allegations relating to Ms. Valim's presence in New York in the eight months since the Complaint was filed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint for lack of personal jurisdiction, or in the alternative, for forum non conveniens should be denied.

Dated: May 16, 2024                    QUINN EMANUEL URQUHART &
      New York, New York              SULLIVAN, LLP

By:   /s/ Michael B. Carlinsky

Michael B. Carlinsky
Mario O. Gazzola
Danielle Lazarus

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
michaelcarlinsky@quinnemanuel.com
mariogazzola@quinnemanuel.com
daniellelazarus@quinnemanuel.com

*Attorneys for Plaintiff*

31