UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SIGMA LITHIUM CORPORATION,

Plaintiff,

v.

CALVYN GARDNER and LUIZA VALIM,

Defendants.

---

23 Civ. 7403 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

Plaintiff Sigma Lithium Corporation ("Sigma") brings this action against Defendants Calvyn Gardner ("Gardner") and Luiza Valim ("Valim") for conversion and theft of trade secrets, and against Defendant Valim for violations of the Computer Fraud and Abuse Act. *See* Compl. ¶ 11, ECF No.1. Before the Court are Defendants' Motion to Dismiss the complaint for lack of personal jurisdiction, or, in the alternative, based on *forum non conveniens*; and a motion for Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") to withdraw as counsel for Sigma. *See* Mot. to Dismiss, ECF No. 36; Mot. to Withdraw, ECF No. 66. For the reasons set forth below, the Motion to Dismiss is **GRANTED** and the Motion to Withdraw is **GRANTED**.

## BACKGROUND

The Court assumes the parties' familiarity with the facts alleged in the Complaint and recounts those facts here only as relevant to the questions of jurisdiction and venue raised in Defendants' Motion to Dismiss.[1] Sigma is a "Canada-based lithium processing and development company" with its "principal place of business [in] Brazil."[2] Compl. ¶ 12. Ana Cabral-Gardner

---

[1] Except where otherwise noted, the facts are drawn from the Complaint and are accepted as true solely for purposes of adjudicating the Motion to Dismiss.

[2] Defendants clarify that Sigma is a holding company headquartered in Vancouver, Canada that operates through its wholly owned indirect subsidiary, Sigma Brazil. *See* Defs.'

("Cabral") is Sigma's current Chief Executive Officer ("CEO") and co-Chairman of the Board. *Id.* ¶ 3. She is a citizen and resident of Brazil.[3] *See id.* ¶ 26. Defendant Calvyn Gardner is a British national and Brazilian resident. *Id.* ¶ 13. Between 2018 and 2023, he held various positions at Sigma, including Chief Executive Officer, Co-Chief Executive Officer, Lead Technical Chief Executive, and member of the Board of Directors. *Id.* Cabral and Gardner were married from 2010 to 2020 and previously served together as co-CEOs of Sigma. *Id.* ¶ 3. Defendant Luiza Valim is Gardner's daughter-in-law and a citizen and resident of Brazil; she worked for A10 Serviços Especializados de Avaliação de Empresas Ltda. ("A10"), an entity related to an investment vehicle co-owned by Gardner and Cabral, A10 Investimentos Fundo de Investimento de Ações – Investimento no Exterior. *Id.* ¶¶ 3-4, 14.

In September 2022, Sigma held a board meeting in New York City, at which Gardner was present. *Id.* ¶ 29. At the meeting, the board "voted to approve the creation of a special committee to explore M&A options." *Id.* After the board vote, the special committee "engaged a sophisticated New York-based financial advisor [with Bank of America] to manage the M&A process out of New York." *Id.* ¶ 30; *see id.* ¶ 32. In November 2022, Valim began working for A10. *Id.* ¶ 14. In her role "as an A10 employee seconded to Sigma,"[4] Valim became one of Sigma's "leads in interfacing with the New York-based financial advisor." *Id.* ¶ 31. "Valim communicated multiple times a day with Sigma's New York based bankers regarding arranging

---

Mem. L. Supp. Mot. Dismiss ("Defs.' Br.") at 7, ECF No. 40; *see* Decl. of Mark McDonald Supp. Defs' Mot. Dismiss ("McDonald Decl.") Exs. E & F, ECF Nos. 37-5, 37-6.

[3] While the Complaint states only that Brazil was Cabral's country of residence at the time of her marriage ceremony, Defendants assert that she is "a Brazilian citizen and resident," and Plaintiff does not challenge that point. *See* Defs.' Br. at 8; *see generally* Pl.'s Mem. Law Opp'n Defs.' Mot. Dismiss ("Pl.'s Br."), ECF No. 47.

[4] Defendants contend that Valim's position with A10 Serviços was never formalized because Cabral never signed her employment agreement. *See* Defs.' Br. at 8; Decl. of Luiza Valim Supp. Defs' Mot. Dismiss ("Valim Decl.") ¶ 6, ECF No. 39.

the deal-process, via telephone, email, and Zoom." *Id.* "As a result of Valim's role, Valim obtained access to Sigma's confidential data room supporting the M&A process, which was managed and organized by the New York-based financial advisor, and hosted in the United States." *Id.* ¶ 32.[5]

Soon after the September 2022 board meeting in New York City, and around two years after the couple had separated, Gardner initiated divorce proceedings against Cabral in Brazil. *Id.* ¶ 4. Sigma alleges that—for reasons related to Valim's concerns about how much her father-in-law would be awarded in the divorce agreement—Valim resigned from A10 in May 2023, thereby severing her relationship with Sigma. *Id.* ¶ 43. Shortly thereafter, she allegedly used her Sigma employee ID and password to access the data room and download approximately 80,000 confidential files. *Id.* ¶¶ 45-46. Sigma believes Valim subsequently shared the information she had obtained with Gardner while he was visiting the United States to attend his daughter's college graduation. *Id.* ¶ 49. Sigma alleges that "Gardner has used these materials . . . to advance his own agenda of harming Sigma and its shareholders, including by using them in the divorce proceedings." *Id.* ¶ 52. Sigma also alleges that Valim's conduct has caused Sigma significant expense and irreparable harm. *Id.* ¶ 53. Specifically, Sigma alleges that "the theft of data in support of Gardner's campaign to harm Sigma has delayed and risked Sigma's M&A process, harmed the Company's credibility—as all potential buyers were blindsided by Gardner and Valim's attempts to interfere with the M&A process, and caused the risk of loss or disclosure of Sigma's confidential information." *Id.*

---

[5] The parties dispute the location of the server hosting the data room. *See, e.g.*, Defs.' Br. at 13 (arguing that it the data room is hosted in Brazil); Pl.'s Br. at 4 n.3 (arguing that the data room is hosted in the United States). Because neither party argues that the data room was hosted in New York, specifically, the parties' disagreement is irrelevant to the jurisdictional analysis and the Court need not resolve it.

Sigma filed suit in this Court on August 21, 2023.  *See* Compl.

## LEGAL STANDARDS

"Plaintiffs opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction have the burden of establishing that the court has jurisdiction over the defendant." *Palmer v. eCapital Corp.*, No. 23 Civ. 4080, 2024 WL 3794715, at *4 (S.D.N.Y. Aug. 13, 2024).[6]  To meet this burden at the motion to dismiss stage, a plaintiff must plead facts that are legally sufficient for a showing of jurisdiction.  *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  The Court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor."  *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008).  But plaintiffs cannot meet their burden at the motion to dismiss stage simply by relying on "conclusory statements without any supporting facts."  *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014).

To determine whether it may exercise personal jurisdiction over non-domiciliary defendants, the Court must engage in a two-step analysis.  *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163-64 (2d Cir. 2010).  First, the Court must ask whether New York's long-arm statute, N.Y. C.P.L.R. § 302, permits the exercise of specific personal jurisdiction over the defendant.  *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).  Second, if personal jurisdiction is permissible under the long-arm statute, then the Court must ensure that its exercise of personal jurisdiction "comports with the Due Process Clause of the United States Constitution."  *See Chloé*, 616 F.3d at 164.  This Due Process analysis asks whether the

---

[6] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

defendant has sufficient "minimum contacts" with the forum state to justify the exercise of

specific personal jurisdiction and whether exercising jurisdiction over the particular defendant

aligns with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945).

As relevant here, New York's long-arm statute provides:

(a) Acts which are the basis of jurisdiction.  As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

   (i)    regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

   (ii)   expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a).

### DISCUSSION

## I.    Motion to Dismiss for Lack of Personal Jurisdiction

Sigma invokes each of the three grounds in New York's long-arm statute for personal

jurisdiction over Valim: transaction of business within the state, § 302(a)(1); commission of a

tortious act within the state, § 302(a)(2); and commission of a tortious act without the state

causing injury within the state, § 302(a)(3).  As for Gardner, Sigma invokes only § 302(a)(1) and

§ 302(a)(3).  Defendants move to dismiss for lack of personal jurisdiction, arguing that none of

the requirements of § 302(a) have been satisfied and that, even if they had, the exercise of

jurisdiction would not comport with due process.  Defs.' Br. at 5, 25.  In the alternative,

Defendants move to dismiss under the doctrine of *forum non conveniens*.  *Id.* at 6, 26.

### A.    CPLR § 302(a)(1)

Under N.Y. C.P.L.R. § 302(a)(1), the Court must determine "(1) whether the defendant

'transacts any business' in New York, and, if so, (2) whether this cause of action arises from

such a business transaction."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).

As to the first prong of § 302(a)(1), "the overriding criterion necessary to establish a transaction

of business is some act by which the defendant purposefully avails itself of the privilege of

conducting activities within New York."  *Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830, 834 (N.Y.

2007).  "Purposeful activities are those with which a defendant, through volitional acts, avails

itself of the privilege of conducting activities within the forum State, thus invoking the benefits

and protections of its laws."  *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007).  Thus, even

when the defendant was never physically present in New York, "jurisdiction may still be proper

if the defendant on his or her own initiative projects himself or herself into this state to engage in

a sustained and substantial transaction of business."  *Id.* at 28.

As to the second prong of § 302(a)(1), "a suit will be deemed to have arisen out of a

party's activities in New York if there is an articulable nexus, or a substantial relationship,

between the claim asserted and the actions that occurred in New York."  *Best Van Lines, Inc.*,

490 F.3d at 246.  This "does not require a causal link," but rather requires "a relatedness between

the transaction and the legal claim such that the latter is not completely unmoored from the

former."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir.

2013).  "A connection that is 'merely coincidental' is insufficient to support jurisdiction."  *Best

Van Lines, Inc.*, 490 F.3d at 249; *see also Licci v. Lebanese Canadian Bank*, 984 N.E.2d 893,

901 (N.Y. 2012) ("Where this necessary relatedness is lacking, we have characterized the claim

as 'too attenuated' from the transaction, or 'merely coincidental' with it.").

       1.     *Application of § 302(a)(1) to Valim*

     Sigma argues that Valim "transacted business in the State of New York through her

repeated and frequent interaction with the New York-based Financial Advisor" at Bank of

America, with whom she interacted "on virtually a daily basis" for over eight months.  Pl.'s Br.

at 10.  According to Sigma, "the only reason Ms. Valim had access to the data room at all is

because the Financial Advisor coordinated [her] access" to it.  *Id.*  Thus, although Valim was

based in Brazil, Sigma argues that "[t]he quality and frequency (over the course of 8 months) of

[her] contacts . . . establishes a transaction of business in New York."  *Id.* at 12.[7]  Defendants

counter that any contact Valim had with bankers located in New York was "entirely incidental,

not purposeful," and thus does not rise to the level required under § 302(a)(1).   Def.'s Mem. L.

Supp. Mot. Dismiss ("Def.'s Br.") at 21, ECF No. 40.  The Court agrees.

     In assessing whether Valim transacted business in New York, "the overriding criterion"

is whether she "purposefully avail[ed] [her]self of the privilege of conducting activities within

New York," thus "invok[ing] the benefits and protections of our laws."  *Ehrenfeld*, 881 N.E.2d at

834-35.  Sigma has shown no such purposeful projection into the State of New York.  Assuming

the truth of Sigma's allegation that the relevant Bank of America advisors were based in New

York, *see supra* n.7, the facts at most establish that *Sigma* projected itself into New York when it

---

[7] Defendants contend that the bankers with whom Valim was communicating were
mostly based in Latin America.  *See* Defs.' Br. at 21.  Specifically, Valim swears in her
declaration that she "had contact from Brazil with personnel from Bank of America's Latin
America Team, including primarily Martin Saravia, who [she] understand[s] lives in Salta,
Argentina."  Valim Decl. ¶ 5.  But Sigma responds that "[f]or this engagement, Mr. Saravia
operated out of the New York office."  Pl.'s Br. at 4 n.2.  For purposes of deciding the Motion to
Dismiss, the Court resolves this doubt in favor of Sigma and assumes that Mr. Saravia was based
in New York at the relevant times.

formed a relationship with those financial advisors.  The facts do not show that Valim, "on . . .

her own initiative," "project[ed] . . . herself into this state to engage in a sustained and substantial

transaction of business," *Fischbarg*, 880 N.E.2d at 28.  Nor do they show that she took any

"volitional acts" to avail herself of the benefits and protections of New York's laws, *id.* at 26.

Rather, they show that she was communicating with the financial advisors on Sigma's behalf as

required by her position.[8]  And as a "general proposition," "telephone calls, e-mails and faxes are

not, in and of themselves, sufficient long-arm predicates."  *Fischbarg*, 880 N.E.2d at 27 n.6; *see*

*also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128-29 (2d Cir. 2013) ("New York courts

have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of

defendant's communication from another locale with a party in New York.").

   Sigma cites several cases that found personal jurisdiction over out-of-state defendants

who communicated with plaintiffs in New York via telephone and email, but unlike the

defendants in those cases, Valim is not alleged to have solicited the financial advisors' services

to begin with or to have signed any agreement with them.  *See Fischbarg*, 880 N.E.2d at 26-27

(finding personal jurisdiction over out-of-state defendants who "sought out plaintiff in New York

and established an ongoing attorney-client relationship with him"); *Kogan Law Grp. v. Brace*,

No. 20 Civ. 1012, 2020 WL 5038764, at *5 (S.D.N.Y. Aug. 26, 2020) (finding personal

jurisdiction over out-of-state defendant who met a lawyer at a conference in New York, signed

an engagement agreement with the lawyer's New York-based firm, and then "repeatedly

---

   [8] Sigma made additional arguments supported by various exhibits (Exhibits 3, 4, and 5 to
the Carlinsky Declaration, *see* ECF Nos. 45-3, 45-4, and 45-5), which it now asks this Court to
"not consider;" or, alternatively, to permit Sigma to withdraw these exhibits and to refile its
opposition to Defendants' motion to dismiss without reference to these exhibits.  *See* Sealing
Op., ECF No. 70.  This request is addressed below.

projected himself into New York by calling and emailing" the lawyer); *Sec. Nat'l Bank v. Republic Nat'l Life Ins. Co.*, 364 F. Supp. 585, 589 (S.D.N.Y. 1973) (finding personal jurisdiction in a breach-of-contract case in which "the contract sued upon [was] executed in New York"). Nor are there any factual allegations showing that Valim was "invoking the benefits and protections of [New York's] laws," *see Fischbarg*, 880 N.E.2d at 26, when she communicated with the financial advisors.

Because Sigma has not established that Valim transacted business under § 302(a)(1), the Court need not consider whether the claim here "arises from" that transaction. The Court notes, however, that according to Sigma, Valim's "role consisted of working with Sigma's New York-based financial advisor to manage a data room supporting Sigma's M&A process and populate it with Sigma's confidential and trade secret documents." Pl.'s Mem. L. Opp'n Def's Mot. Dismiss ("Pl.'s Br.") at 1, ECF No. 47. If indeed Valim had access to Sigma's documents independently of the financial advisors and was herself responsible for uploading them to Sigma's data room, then it is entirely unclear what connection there is between her communications with the New York-based financial advisors and her alleged misappropriation of Sigma's documents.

### 2. Application of § 302(a)(1) to Gardner

Plaintiff argues that Gardner "also transacted business in New York by voting to initiate the M&A process at a board meeting [on September 13, 2022] in New York," and that this legal dispute "arises from his business transaction, because without an M&A process, the data room would not have been updated with the documents Ms. Valim stole." Pl.'s Br. at 15. This argument also fails. Assuming without deciding that Gardner's attendance at the September 2022 board meeting constitutes the transaction of business, thereby satisfying § 302(a)(1)'s first prong, it nevertheless fails to satisfy the second "nexus" prong.

Sigma's nexus theory fails because the legal claim here—theft of proprietary documents—is both coincidental with and highly attenuated from Gardner's only alleged New York transaction—his attendance at the meeting where the board of directors "voted to approve the creation of a special committee to explore M&A options," Compl. ¶ 29.  First, the meeting's location in New York appears to have been a coincidence: Sigma has held board meetings in various countries, but the board happened to be in New York that day "to ring in the Nasdaq closing bell."  Decl. of Calvyn Gardner Supp. Defs.' Mot. Dismiss ("Gardner Decl.") ¶ 3, ECF No. 38.  In other words, the same vote to approve the creation of a special committee to explore M&A options could have happened anywhere.  *See Johnson v. Ward*, 829 N.E.2d 1201, 1203 (N.Y. 2005) ("The negligent driver could have had a license from any state, or no license—that defendant had a New York license and registration is merely coincidental.").

Second, Sigma fails to explain how Gardner's alleged misconduct in this case—his receipt of documents allegedly stolen from the data room in May 2023—arises from his attendance at the board meeting in New York.  Sigma's attempt to articulate a nexus between those two events elides numerous steps in a highly attenuated chain of events.  For example, it was not until after the board meeting that the special committee decided to initiate the M&A process and engage the financial advisor to manage that process.  *See* Compl. ¶ 30; Gardner Decl. ¶¶ 4-5.  Gardner was not on the special committee that made the decision to hire the financial advisor, nor is he otherwise alleged to have played any role in that decision.  *See* Compl. ¶ 30; Gardner Decl. ¶¶ 4-5.  Any connection between the board meeting and the alleged tortious conduct in this case—which occurred eight months later and thousands of miles away—is simply too remote to satisfy the nexus requirement.[9]  *See AVRA Surgical Robotics, Inc. v.*

---

[9] Sigma argues that "without an M&A process, the data room would not have been updated with the documents," Pl.'s Br. at 15, but that does not constitute the sort of "articulable

*Gombert*, 41 F. Supp. 3d 350, 359 (S.D.N.Y. 2014) (finding no personal jurisdiction over

Germany-based defendant where "all the relevant alleged conduct occurred thousands of miles

away in Germany," even though defendant had attended a single meeting in New York at which

he was appointed executive vice president of the plaintiff corporation).

Sigma cites three cases finding personal jurisdiction over out-of-state defendants who had

participated in meetings in New York—but the claims in those cases were for breach of contract,

and the meetings in New York were directly related to the contracts in dispute.  *See Newman*

*Cap. LLC v. Priv. Cap. Grp.*, No. 22 Civ. 663, 2024 WL 2115311, at *7 (S.D.N.Y. May 10,

2024) (finding personal jurisdiction where defendants traveled to New York "more than 15 times

including to meet potential investors" and the meetings were "related to the contracts at issue in

this lawsuit"); *State v. Vayu, Inc.*, 39 N.Y.3d 330, 337 (2023) (finding personal jurisdiction over

defendant who participated in a meeting in New York and follow-up conversations with the New

York-based plaintiff, all of which "designedly and materially forwarded the negotiation and

performance of the contract for the sale"); *Stroock & Stroock & Lavan v. Valley Sys., Inc.*, No.

95 Civ. 6513, 1996 WL 11249, at *3 (S.D.N.Y. Jan. 11, 1996) (finding that interview conducted

in New York, alongside other contacts, helped establish personal jurisdiction because it

"significantly advanced and was substantively important to the creation of the agreement" at

issue).

Here, by contrast, Gardner's sole meeting in New York was not related to the cause of

action itself; rather, it approved the creation of a committee to explore the possibility of an M&A

process, which later led to the retention of financial advisors to manage the process, who later

---

nexus" or "substantial relationship" between Gardner's attendance at the board meeting and the
underlying claim sufficient to satisfy the standard for § 302(a)(1)'s second prong. *Best Van*
*Lines*, 490 F.3d at 246.

coordinated Valim's access to the data room, which Valim subsequently populated with Sigma's

documents, which were then allegedly misappropriated by Valim and received by Gardner.  That

the connection is so attenuated is a sign that there is no "articulable nexus" or "substantial

relationship" between the board meeting in New York and the claim in this case.  *See Best Van

Lines*, 490 F.3d at 246.  Accordingly, § 302(a)(1) does not support the exercise of specific

personal jurisdiction over Gardner.

    **B.**    **CPLR § 302(a)(2)**

As to Valim only, Sigma invokes CPLR § 302(a)(2), which permits courts in New York

to exercise personal jurisdiction over "any non-domiciliary . . . who . . . commits a tortious act

within the state."  N.Y. C.P.L.R. § 302(a)(2).  As the Second Circuit has explained, "CPLR

§ 302(a)(2) reaches only tortious acts performed by a defendant who was *physically present* in

New York when he performed the wrongful act."  *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28

(2d Cir. 1997) (emphasis added); *accord Edwardo v. Roman Cath. Bishop of Providence*, 66

F.4th 69, 75 (2d Cir. 2023).  Sigma does not contend that Valim was physically present in New

York at the time of the alleged misappropriation; CPLR § 302(a)(2) is therefore inapplicable.

Nevertheless, relying on New York Supreme Court cases and one case in this District

involving trademark infringement, Sigma argues that, under CPLR § 302(a)(2), a "defendant

need not be physically present in New York for their tortious conduct to have a locus in, and

therefore have been committed within, the state of New York."  Pl.'s Br. at 17.  But Sigma's

authority is not controlling.  While "some New York Supreme Court cases have held that

§ 302(a)(2) does not require physical presence," the Second Circuit's "contrary interpretation . . .

relied on several decisions of the New York Court of Appeals, which expressly held that physical

presence was required."  *Thackurdeen v. Duke Univ.*, 660 F. App'x 43, 46 n.4 (2d Cir. 2016).

"In the absence of some indication by the New York Court of Appeals that those decisions no

longer represent the law of New York," the Second Circuit "will not overrule [its] own longstanding interpretation of § 302(a)(2)."  *Id.*  Nor will this Court disregard the Second Circuit's rulings.  Under binding precedent, § 302(a)(2) cannot support personal jurisdiction over Valim.

C.     **CPLR § 302(a)(3)**

Finally, Sigma argues that both Valim and Gardner are subject to jurisdiction under New York's long-arm statute because they "commit[ed] a tortious act without the state causing injury to person or property within the state" and "regularly do[] or solicit[] business in the state."  N.Y. C.P.L.R. § 302(a)(3); *see* Pl.'s Br. at 20.  Sigma's theory of in-state injury is that Valim and Gardner "jointly disrupted the ongoing deal process based in New York," which "caused injury within the state, namely, via a decline in the price of Sigma's shares, which are traded on NASDAQ."  Pl.'s Br. at 21.  But Sigma's Complaint nowhere alleges a decline in the price of Sigma shares on NASDAQ.  *See* Compl. ¶ 12 (alleging only that Sigma is traded on NASDAQ); *id.* ¶¶ 58, 64, 74, 85 (alleging harm to Sigma without mentioning share price).  Thus, even if the Court were to accept Sigma's theory that a decline in the price of shares traded on NASDAQ constitutes an injury in New York for purposes of § 302(a)(3)—a theory that the Court notes would have far-reaching implications—there is no allegation of such a decline here.  In any event, Plaintiff has also failed to establish that either Valim or Gardner "regularly does or solicits business" in New York or "expects or should reasonably expect the[ir] act[s] to have consequences" in New York.  N.Y. C.P.L.R. § 302(a)(3)(i)-(ii).  Sigma has therefore failed to make a prima facie showing of personal jurisdiction under § 302(a)(3).

\* \* \*

In sum, Sigma has failed to make "legally sufficient allegations of jurisdiction," *Whitaker*, 261 F.3d at 208, under New York's long-arm statute.  Because there is no statutory

13

basis for jurisdiction, the Court need not decide whether the exercise of jurisdiction would comport with due process. Nor does the Court reach Defendants' argument in the alternative that this case should be dismissed based on *forum non conveniens*.

## II.     Leave to Amend

Plaintiff also requests "leave to move for limited jurisdictional discovery related to Defendants' contacts with the State of New York" or "leave to amend the Complaint." Pl.'s Br. at 28. Both requests are denied.

A court may grant jurisdictional discovery if a plaintiff identifies a "genuine issue of jurisdictional fact," but "discovery need not be granted to allow [P]laintiff to engage in an unfounded fishing expedition for jurisdictional facts." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 402 (S.D.N.Y 2009). *Cf.* Pl.'s Br. at 29-30. Here, Sigma has not identified any genuine issues of jurisdictional fact. To the extent the parties disagree about the relevant facts, the Court has resolved those doubts in favor of Sigma and nevertheless found personal jurisdiction to be lacking. Accordingly, Sigma "ha[s] made no factual allegations which could be proven through additional discovery that would change the outcome of this issue." *Fridman*, 643 F. Supp. 2d at 402.

Sigma also seeks leave to conduct jurisdictional discovery to inquire into Defendants' contacts with New York since the filing of the Complaint, noting that it has learned that Valim has "visited New York frequently since her husband began a master's program at Columbia University" in September 2023. Pl.'s Br. at 7, 29. Alternatively, Sigma seeks leave to amend so that it can "assert additional jurisdictional allegations, including allegations relating to Valim's presence in New York in the eight months since the Complaint was filed." Pl.'s Br. at 30. But "only pre-litigation contacts are relevant to the jurisdictional question," *Brownstone Inv. Grp. LLC v. Bonner & Partners, LLC*, No. 20 Civ. 7351, 2021 WL 3423253, at *3 (S.D.N.Y. Aug. 5,

14

2021) (Nathan, J.), so the information Sigma seeks cannot change the outcome here.  Leave to

amend would not re-set the clock and make Sigma's proposed allegations relevant, because the

question is whether "the transaction occurred before litigation commenced," not whether it

occurred before the filing of an amended complaint.  *Id.*  And Plaintiff fails to identify any other

facts—beyond pure speculation—that it could allege to cure the jurisdictional defects in its

Complaint.  Accordingly, leave to amend would be futile.  *See Cuoco v. Moritsugu*, 222 F.3d 99,

112 (2d Cir. 2000) (affirming denial of leave to amend on futility grounds where plaintiff "ha[d]

suggested no new material she wishe[d] to plead").

### III.    Sealing and Redaction Request

As noted, Sigma sought leave to maintain various exhibits under seal and to redact

portions of its opposition brief arguing that various aspects of its own agreement with Bank of

America show that Valim purposefully availed herself of the privilege of conducting business in

New York.  *See* Mot. to Seal at 1, ECF No. 44; Pl.'s Br. at 10-11.  The Court previously denied

the redaction requests principally as moot because Sigma did not object to the public filing of

Defendants' reply brief, which repeated most of the statements Sigma had sought to redact.  *See*

Sealing Op. at 3-4.  The Court also denied as overbroad the request to seal the exhibits in their

entirety, but stated that it was open to Sigma's proposing limited redactions to those exhibits and,

if relevant, to any corresponding statements in its brief or declaration that had not yet been

published on the public docket.  *See id*. at 4.

In response, counsel for Sigma proposed three alternative paths forward, apparently in

order of preference.  *See* Letter, ECF No. 72.  First, Sigma proposed that the Court "maintain

these documents under seal and not consider them in ruling on Defendants' Motion to Dismiss."

*Id*. at 1.  Sigma argued that, "should the Court not rely on these documents in connection with

the Court's decision . . . , they would not be judicial documents, and therefore there would be no

presumption of public access attached to them." *Id.* Second, and in the alternative, Sigma requested leave to withdraw the three exhibits in question and refile its opposition brief without reference to the exhibits. *Id.* Third, if the Court were to deny the first two requests, Sigma requested an extension of time to obtain new counsel and to "propose specific redactions with the assistance of replacement counsel." *Id.* at 2.

Sigma's first request is that the Court simply not rely on the purportedly confidential documents it submitted in support of its opposition to the Motion to Dismiss. But the Second Circuit has "expressly rejected the proposition that different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving a [dispositive] motion." *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019). Rather, it is well-settled that documents submitted to a court for consideration in connection with a dispositive motion "are—as a matter of law—judicial documents to which a strong presumption of access attaches." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006) (discussing summary judgment motions); *see Olson v. Major League Baseball*, 29 F.4th 59, 90 (2d Cir. 2022) (describing "strong presumption [of access] to materials filed in connection with dispositive motions"). The Court therefore cannot maintain the documents under seal while ignoring them.

Sigma's second request is more viable. The Second Circuit's "holding in *Lugosch*," quoted above, "relies on the general principle that parties may 'be assumed to have supported their papers with admissible evidence and non-frivolous arguments.'" *Brown*, 929 F.3d at 47 n.12 (quoting *Lugosch*, 435 F.3d at 122). "Insofar as a district court has, through striking a filing, specifically found that assumption inapplicable, the categorical rule in *Lugosch* may not apply." *Id.* Here, the Court construes Sigma's request to withdraw the exhibits as an admission that the arguments the exhibits purported to support are irrelevant to the Court's consideration of

16

the Motion to Dismiss—essentially, frivolous.  Having reviewed the arguments in question, the Court agrees that they have no bearing on the question of personal jurisdiction over Valim and Gardner.  The assumption that parties have "supported their papers with . . . non-frivolous arguments," *id.*, is therefore inapplicable, and the Court **GRANTS** Sigma's request to strike the exhibits.[10]

As for the proposed redactions to Sigma's opposition brief and the Declaration of Marina Bernardini, the Court has already noted that nearly all of the material sought to be redacted is now publicly available in Defendants' reply brief.  *See* Sealing Op.  Accordingly, Sigma's request to redact its opposition and accompanying declaration is **DENIED AS MOOT**.

## CONCLUSION

For the reasons stated above, Sigma's request to withdraw certain exhibits (ECF Nos. 45-3, 45-4, and 45-5 (sealed exhibits), and 48-3, 48-4, 48-5 (public placeholder exhibits)) is **GRANTED**.  Furthermore, because the Court concludes that it lacks personal jurisdiction over Defendants, the Complaint is **DISMISSED** without prejudice to renewal in a court where personal jurisdiction is proper.[11]  In light of the Court's decision granting Defendants' Motion to Dismiss, Quinn Emanuel's motion to withdraw as counsel for Sigma, ECF No. 66, is **GRANTED**.

---

[10] Although Defendants argue that Sigma must withdraw its entire opposition if it wishes to withdraw the exhibits, *see* Pl.'s Letter re Sealing, ECF No. 73, the Court concludes that, under the language quoted above from *Brown* and general principles of docket management, it may strike specific filings without striking Plaintiff's entire opposition.

[11] Defendants ask to dismiss the case with prejudice, *see* Defs.' Br. at 6, but dismissal for lack of jurisdiction is without prejudice.  *See Meyer v. Kansas City S. Ry. Co.*, 84 F.2d 411, 415 (2d Cir. 1936).

Quinn Emanuel is directed to serve a copy of this Opinion and Order on Sigma within three business days of the date of this Order and to file proof of service on the docket within two business days of such service.

The Clerk of Court is respectfully requested to strike ECF Nos. 45-3, 45-4, and 45-5 (sealed exhibits), and 48-3, 48-4, 48-5 (public placeholder exhibits); and to unseal ECF Nos. 46 (Declaration of Marina Bernardini) and 47 (Memorandum of Law in Opposition to Defendants' Motion to Dismiss). The Clerk of Court is respectfully requested to terminate ECF Nos. 36 and 66, and to close this case.


SO ORDERED.

Dated: May 1, 2025

New York, New York


_____

DALE E. HO
United States District Judge